United States District Court
Southern District of Texas
**ENTERED**
November 21, 2016
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER LUCAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-15-2825 |
| | § | |
| T-MOBILE USA, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Christopher Lucas, an individual with attention deficit hyperactivity disorder, sued his former employer, T-Mobile USA, Inc., alleging that it violated the Americans with Disabilities Act when it transferred him from one store to another, put him on a performance improvement plan, and eventually fired him.  T-Mobile moved for summary judgment, Lucas  responded, and T-Mobile replied.  (Docket Entry Nos. 20, 22, and 25).  Based on the pleadings, motions, the summary judgment record, and the applicable law, T-Mobile's motion for summary judgment is granted.  The reasons are explained in detail below.

**I.      Background**

The summary judgment evidence, construed in Lucas's favor, shows the following.  T-Mobile hired Lucas as a retail store manager in October 2013.  (Docket Entry No. 22-1, Ex. A at 9).  Johnny Castro, T-Mobile's District Manager for Houston West, was Lucas's manager.  (Docket Entry No. 22-2, Ex. B at 6; Docket Entry No. 22-1, Ex. A at 18).  After training, Lucas was placed in charge of a brick-and-mortar T-Mobile retail store located on Silber Road in Houston.  (*Id.* at 11).

In December 2013, Lucas was diagnosed with ADHD.  (*Id.* at 42-45).  Lucas informed

1

Castro of the diagnosis on the same day he received it and sent Castro a copy of a self-help book for adults with ADHD that his psychiatrist had given him. (*Id.* at 45). Lucas was prescribed medication for his ADHD in January 2014, and told Castro about the medication a short time later. (*Id.* at 47).

In April 2014, Castro transferred Lucas from the brick-and-mortar store on Silber to a kiosk located at the Katy Mills Mall because, Castro claimed, Lucas's performance at the store was unsatisfactory. (*Id.* at 23-24). T-Mobile emphasizes that this was the culmination of a multi-month failed effort to improve Lucas's management of the brick-and-mortar store. T-Mobile's evidence indicates that Castro had begun meeting with Lucas about his performance beginning on January 10, 2014. At that first meeting, Castro told Lucas that he needed to improve the store's performance metrics. (Docket Entry No. 20-1, Ex. A at 23-24). Castro and Lucas also met on February 12 and February 17. At those meetings, Castro told Lucas what specific performance metrics he believed needed improvement. (*Id.*). In early March, Castro began a formal "performance improvement process" for Lucas. (Docket Entry No. 20-4, Ex. D at 3). In early April, Castro, Lucas, and Syreeta Elmore, a T-Mobile human-resources employee, met to discuss a "Store Environment Survey" that Elmore had conducted as part of the performance improvement process for Lucas. That survey indicated a number of employee complaints about Lucas's management style, including allegations that he used profanity and mocked employees. (*Id.*). When things did not improve by the beginning of May, Castro decided to transfer Lucas to a kiosk location at the Katy Mills Mall. The stated reason for the transfer was that Lucas's management of the store was unsatisfactory, and the kiosk would give him an opportunity to improve his performance in a smaller, lower-stakes environment. (*Id.*).

Lucas argues that, contrary to T-Mobile's claims, the Silber store did well under his

leadership. (Docket Entry No. 22 at 8). Specifically, Lucas argues that the store's "conversion metric" doubled relative to the store's past year's performance. (*Id.*, citing Docket Entry No. 22-1, Ex. A at 24). In response, T-Mobile emphasizes that its evaluation of store performance depends not only on specific year-over-year comparisons of a single store's numbers, but also examination of a store's performance with adjustments based on market conditions. (Docket Entry No. 20 at 12-13). T-Mobile puts forward evidence that this more complex metric, which it refers to as a store's "skip level," is the metric that it emphasizes to store managers as the number to work to meet or beat. (Docket Entry No. 20-4, Ex. D at 3). T-Mobile's evidence suggests that under Lucas's management, the Silber location significantly underperformed other stores in the Houston sales region on the "skip level" metric. (*Id.*).

Lucas also puts forward evidence that the day after he was informed that he would be transferred to the kiosk location, he met again with Elmore, the HR representative. At that meeting, Lucas explained the challenges facing him as a result of his ADHD. He complained to Elmore that he felt mistreated, and that the kiosk posting would be difficult because of his ADHD. (Docket Entry No. 22-1, Ex. A at 30-31). Lucas argues that, under his leadership, the kiosk's sales nonetheless excelled. (Docket Entry No. 22 at 9). But on June 16, Castro sent him a "Formal Reminder" (the next step in the formal performance-improvement process), stating that Lucas's kiosk was lagging the area "skip level." (Docket Entry No. 20-4, Ex. D at 4). The two met on June 16. Lucas gave Castro three articles on ADHD and its effects on adults in the workplace. (Docket Entry No. 20-1, Ex. A at 37-39). Lucas expressed his belief that Castro had consistently disregarded his disability. That same day, Lucas submitted a formal complaint through T-Mobile's internal grievance mechanism, charging that Castro had disregarded his ADHD and explaining why he

thought the transfer to the kiosk was improper.  (Docket Entry No. 22-8, Ex. H).  Lucas also sent Elmore an email outlining similar concerns.  (Docket Entry No. 22-8, Ex. I).  Lucas and Elmore met on June 24, and discussed Lucas's complaints about Castro.  (Docket Entry No. 22-1, Ex. A at 49-50).  At that meeting, Lucas expressed his view that he needed accommodations for his ADHD.  (*Id.*).

The next day, Elmore emailed Lucas asking for copies of any emails that he had sent to Castro that included requests for accommodations regarding Lucas's ADHD.  (*Id.* at 51-52).  One of the emails to Castro that Lucas forwarded Elmore contained a sentence—"ADHD challenges are very strong here for me."—that was not present in the original email.  (*Id.* at 71-72).  Lucas says that he accidentally typed that language in the body of the email, instead of as an additional comment to be included above the forwarded email.  (*Id.*).

In early July 2014, Castro and Elmore met to discuss how to move forward with Lucas's requests for accommodation.  Elmore showed Castro the email that Lucas had (perhaps accidentally) altered; Castro said that he had never received the email.  (Docket Entry No. 20-3, Ex. C at 6-7).  Castro pulled up his email on his computer and showed Elmore the original email, which did not include the sentence about ADHD challenges.  (Docket Entry No. 20-6, Ex. F at 19-20).  Elmore notified Callie Field, the Senior Director of Sales for South Texas, of the apparently altered email.  (Docket Entry No. 20-7, Ex. G at 8).  After investigation, Elmore and Field concluded that Lucas had falsified the email.  (*Id.* at 9).

On July 15, 2014, Lucas met with Elmore and Field; when confronted with the altered email, Lucas explained that he had intended for the added sentence to go above the forwarded email as an explanation of why he was sending the email, rather than as a part of the body of the forwarded

4

message.  (Docket Entry No. 22-1, Ex. A at 73-75).  Field told Lucas that the alteration was a violation of T-Mobile's employee ethics policy and code of conduct, and told him that his employment was terminated.  (*Id.* at 76).

Lucas filed a charge with the Equal Employment Opportunity Commission in December 2014, and received a Notice of Right to Sue letter in June 2015.  (Docket Entry No. 1 at 2).  He sued T-Mobile in this court in September 2015.  (*Id.*).  Lucas argues that T-Mobile discriminated against him in violation of the ADA when it transferred him from the Silber store to the mall kiosk, and again when it terminated his employment.  (Docket Entry No. 22 at 13).  Lucas also argues that T-Mobile retaliated against him when it put him on a formal performance improvement plan, transferred him to the kiosk, and terminated his employment.  (*Id.* at 20).

## II.    Legal Standards

### A.      Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)).  "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

"Once the moving party [meets its initial burden], the nonmoving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *LHC Grp.*, 773 F.3d at 694).  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*,

783 F.3d at 536.

    **B.**    **Disability Discrimination**

The ADA prohibits employers from discriminating "on the basis of disability in regard to . . . [the] discharge of employees." 42 U.S.C. § 12112. When a plaintiff attempts to prove discrimination through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *modified in Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004). *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009 (citing *McInnis v. Alamo Comm. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000)). Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a prima facie showing of discrimination. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rachid*, 376 F.3d at 312. An ADA plaintiff must show that (1) he is disabled, has a record of having a disability, or is regarded as disabled, (2) he is qualified for his job, and (3) he was subjected to an adverse employment action on account of his disability or the perception of his disability. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 695 (5th Cir. 2014). In cases involving alleged work-rule violations, plaintiffs "may establish a prima facie case by showing 'either that [they] did not violate the rule or that, if [they] did, [employees outside the protected class] who engaged in similar acts were not punished similarly.'" *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.1980)); *see also Greene v. Potter*, 240 F. App'x 657, 660 (5th Cir. 2007) (per curiam).

If a plaintiff makes a prima facie showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision. *Cullwell v. City of*

*Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006).  If a defendant can produce such evidence, the presumption of discrimination then dissolves, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000); *Chevron*, 570 F.3d at 615 n.6, and the plaintiff must then identify or offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)."  *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted).  In pretext cases, it is not enough that the company was wrong about the underlying facts that motivated the adverse employment action.  The only question is whether the employer had a good-faith belief that the facts that motivated the adverse action were true.  *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010).  A factual dispute over the employee's innocence of the allegations against him is not enough to survive summary judgment; the plaintiff must put forward evidence sufficient to create a factual dispute as to whether or not the company subjectively believed that the allegations were true.  The plaintiff has the ultimate burden of showing a genuine material factual dispute over whether the defendant discriminated against him on the basis of the plaintiff's membership in the protected class.  *Reeves*, 530 U.S. at 143.

### C.    Retaliation

The ADA prohibits employers from retaliating against employees for engaging in activity protected under the Act.  The scheme for demonstrating retaliation is similar to the modified *McDonnell Douglas* framework discussed above:

> To show an unlawful retaliation, a plaintiff must establish a *prima facie* case of (1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action.  Once the plaintiff has established a prima facie case, the defendant must come forward

with a legitimate, non-discriminatory reason for the adverse employment action.  If such a reason is advanced, the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation.  Ultimately, the employee must show that "but for" the protected activity, the adverse employment action would not have occurred.

*Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (footnotes omitted).

## III.    Analysis

The court assumes, without deciding, that Lucas has made a prima facie showing of discrimination for the decision to put him on a performance-improvement plan, to transfer him, and to terminate his employment.  Each of these actions are analyzed below to determine if there is a factual dispute material to determining whether T-Mobile's proffered reasons were pretextual.

### A.    Transfer

T-Mobile asserts and presents summary judgment evidence showing that it transferred Lucas from the Silber store to the mall kiosk for three reasons: "he was not meeting his performance metrics, the kiosk would provide a smaller, less rigorous environment for him to improve operational skills, and there were fewer employees to supervise at the kiosk."  (Docket Entry No. 20 at 27, citing Docket Entry No. 20-3, Ex. C at 10-13; Docket Entry No. 20-4, Ex. D at 3-4).  T-Mobile emphasizes the fact that Lucas was not meeting his performance metrics, primarily the "skip rate" metric.  (*Id.*).  Lucas advances two arguments for why these reasons are pretextual.  Neither is persuasive.

First, Lucas claims that because Castro referred to only one reason at the time of the transfer, which was that the Silber store's conversion metric was unacceptably low, T-Mobile's statement of additional reasons is inconsistent.  (Docket Entry No. 22 at 17-18).  Genuinely inconsistent or contradictory after-the-fact explanations are certainly a factor that can help demonstrate pretext.

*E.g.*, *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 238 (5th Cir. 2015). But additional reasons for an employment action that are consistent with an earlier explanation and that are based on facts known to the employer at the time the decision was made are not automatically "inconsistent." *Bennett v. Consol. Gravity Drainage Dist. No. 1*, 648 F. App'x 425, 430-31 (5th Cir. 2016) (distinguishing *Burton* on this basis). Here, the additional reasons that T-Mobile provides are consistent with the reason Castro communicated to Lucas: that his conversion metric was too low. T-Mobile's reliance on the "skip rate" measurements is consistent with that explanation, as are the reasons relating to Lucas's ability to do better work in a less demanding post. All of these reasons support T-Mobile's overall explanation for why it put Lucas on the performance-improvement plan and then transferred him: dissatisfaction with his performance as a store manager. This is not the sort of shifting or contradictory explanation that justifies finding pretext.

Second, Lucas argues that these performance-based reasons are inconsistent because the Silber store flourished under his leadership. (Docket Entry No. 22 at 18). Lucas relies on evidence that the store's conversion metric approximately doubled during his tenure. (*Id.*). Lucas ignores T-Mobile's lengthy and record-backed explanation of how it evaluates store managers' performance. That explanation makes clear that T-Mobile did not regard doubling the store's conversion metric as satisfactory performance, because it did not evaluate performance based on a single store's year-over-year numbers considered in a vaccuum. Rather, T-Mobile assembled many factors, including store-specific performance, comparisons between stores, and overall market conditions into a "skip level" measurement that calibrated expected store performance to account for market changes and conditions. T-Mobile presented evidence demonstrating that the Silber store's performance was below the "skip level" metric. (Docket Entry No. 20-4, Ex. D at 3). "[E]ven an incorrect belief that

an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason." *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991). Lucas has not identified or submitted summary judgment evidence showing either that (1) T-Mobile did not really rely on the "skip level" measure to evaluate performance, or that (2) his store actually met or exceeded the "skip level." The fact that Lucas performed well relative to a past year on a single metric does not create a genuine factual dispute on pretext, given the extensive and unrebutted evidence that Lucas's store was underperforming.

### B.    Termination

T-Mobile asserts that it fired Lucas because it believed that he violated the company's code of conduct when, in response to Elmore's request that he forward ADHD-related emails that he had sent to Castro, he sent an altered email. (Docket Entry No. 20 at 26-27). The original email did not contain any ADHD-related statements; the email as forwarded contained the sentence "ADHD challenges are very strong here for me." T-Mobile presented: evidence that Field, who made the termination decision, thought that Lucas had violated the code of conduct by altering the email; evidence that alteration of an email was a violation of the company's code of conduct; and evidence that T-Mobile's standard practice was to terminate employees who altered documents (including emails). (Docket Entries Nos. 20-7, Ex. G at 10-12; 20-2, Ex. B at 3-4). Lucas argues that this explanation is pretextual because he did not intend to modify the email to misleadingly suggest that he had included a sentence about "ADHD challenges" in the body of an earlier email to Castro. Rather, that modification was an accident, and Lucas had intended to include the sentence about ADHD challenges above the forwarded message. (Docket Entry No. 22 at 18-19). Even assuming that the T-Mobile rule barring the alteration of documents would give way if the alteration was a

11

clear addition, not an accidental change that concealed the fact of the change, that does create a factual dispute. Lucas does not dispute or deny that he altered the email. He disputes that he intended to alter it, and that he tried to conceal the alteration. But T-Mobile's uncontroverted evidence shows that Field had a good-faith belief that the rule violation occurred. *Jackson*, 602 F.3d at 379. "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir.1995). Thus, Lucas's insistence that he did not purposefully modify the email to suggest that he had sent additional ADHD-related communications to Castro does not generate a fact issue on pretext.

Lucas's second argument on termination is a repackaged version of his first. Lucas characterizes the argument as a claim that Field did not have a good-faith or reasonable basis to believe that Lucas had doctored the email to make it appear that he had informed Castro about ADHD problems more often than he actually had. But the argument is simply that Field should have believed Lucas's explanation of the alteration. Lucas argues that the fact that there was another email to Castro mentioning ADHD means that Field did not have a reasonable basis for believing that Lucas had purposefully altered the email. (Docket Entry No. 22 at 15-16, 19). Because another email mentioned ADHD, according to Lucas it was unreasonable for Field to believe that he had falsified the email in question, because Lucas would not have a motive to falsify emails regarding his ADHD. Therefore, Lucas says that Field's belief was unreasonable. At most, this argument might show that Field's belief that Lucas had violated the code of conduct was incorrect, not that it was not the real reason that Field fired Lucas. Both Field and Lucas testified that the reason that Field gave for terminating Lucas was that the modification of the email was a violation of the

company's code of conduct.  (*Id.*; Docket Entry No. 20-1, Ex. A at 53-55).  Field considered all of the emails, the code of conduct, and her meeting with Lucas in concluding that Lucas had violated company policy.  (Docket Entry No. 20-7, Ex. G at 14-15).  None of Lucas's arguments give rise to a factual dispute material to determining whether Field's stated belief that Lucas had violated the policy by altering the email was a lie designed to cover up the fact that she fired Lucas because of his disability.

### C.    Performance Improvement Plan

T-Mobile asserts that it put Lucas on a performance improvement plan because his performance was unsatisfactory.  Lucas's only argument in response is to repeat his argument that he thought his performance was excellent.  Lucas's argument that T-Mobile wrongly or mistakenly assessed his performance would, at most, show that T-Mobile erred as a matter of business judgment in putting him on a performance plan.  But that is insufficient to preclude summary judgment.

## IV.    Conclusion

T-Mobile's motion for summary judgment is granted.  Final judgment will be entered by separate order.

SIGNED on November 21, 2016, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge